## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| NORTHBROOK PLIC, LLC,<br>NORTHBROOK VNBP, LLC, and<br>NORTHBROOK SUB, LLC, | )<br>)<br>)<br>) | |
| Plaintiffs, | ) | |
| | ) | Case No. 10 C 0873 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| CVS PHARMACY, INC., | )<br>) | |
| Defendant. | ) | |
| _____ | )<br>) | |
| CVS PHARMACY, INC., | )<br>) | |
| Third-Party Plaintiff, | )<br>) | |
| v. | )<br>) | |
| GARDEN FRESH-NORTHBROOK, INC., | )<br>) | |
| Third-Party Defendant. | ) | |

## MEMORANDUM OPINION & ORDER

Plaintiffs Northbrook PLIC, LLC, Northbrook VNBP, LLC, and Northbrook SUB, LLC (collectively "Northbrook") move for partial summary judgment against Defendant CVS Pharmacy, Inc. ("CVS"), which cross-moves for summary judgment against Northbrook. Northbrook alleges that CVS is liable for breaching its obligations under a guaranty contract. For the reasons stated below, Northbrook's motion is granted in part and CVS's cross-motion is denied.

## I. BACKGROUND

On or about September 21, 1994, Northbrook's predecessor in interest, Orix TMK Northbrook Venture ("Orix"), entered into a lease agreement with Northbrook L.T., Inc. ("LT") for the use of commercial space in the Village Square Shopping Center in Northbrook, Illinois (the "Lease"). LT was a wholly-owned subsidiary of Melville Corporation ("Melville"), which is now CVS. The Lease, which began sometime in 1995, provided for an initial lease-term of fifteen years, plus a partial lease year ending on January 31 of the year following the initial fifteen year term. The rent payments in the Lease began at $49,552.25 during the first five years of the Lease and were to escalate over time. As an inducement to lease the property to LT, Melville agreed to the terms of a guaranty agreement (the "Guaranty"). LT's successor in interest was LNT, Inc. ("LNT"), which merged into LT on or about December 2000. (*See* Ex. A, Tab 5, at GF 1720.)[1]

Pursuant to an assignment and assumption of lease and agreement[2] entered into between LNT and Garden Fresh Northbrook, Inc. ("Garden Fresh") on July 31, 2003 (collectively "the assignment agreements"),[3] Garden Fresh assumed certain obligations under the Lease so that it could occupy the commercial space previously occupied by LNT. The assignment and assumption of the lease indicated that LNT "assigns, conveys, transfers, and sets over onto [Garden Fresh] all of the right, title, interest and estate of

---

[1]   All references to exhibits are from the Plaintiffs' 56.1 Statement of Facts in Support of its Motion for Partial Summary Judgment, ECF No. 52, unless otherwise indicated.

[2]   The assignment and assumption of lease states that it is "subject to that certain Agreement between the parties dated July 31, 2003." (Ex. A, Tab 3, at GF 1652.)  Because the agreement attached to the assignment and assumption of lease is dated July 31, 2003, the court concludes that these two documents are parts of a collective whole.

[3]   The parties agree that these agreements were entered into on July 28, 2003, but review of the agreements indicates that July 28, 2003 was the date that the agreements were revised, not the date the agreements were executed.

[LNT] as tenant under the Lease" (*see* Ex. A, Tab 3, at GF 1651), and the agreement indicated that Garden Fresh was to pay $40,000 per month directly to LNT as monthly rent. (*See id.* at GF 1657.) Nonetheless, the assignment agreements further stipulated that LNT remained responsible to pay Northbrook for the remaining portion of rent, common area maintenance, additional charges, taxes, and insurance costs as defined in the Lease. (*See id.* at GF 1656-57.) Garden Fresh was also obligated to pay LNT 2% of its gross sales every month. (*Id.*) If LNT wished to protest rent or other charges under the Lease, Garden Fresh agreed to cooperate with LNT's efforts, and the parties agreed to indemnify one another if either of them violated Lease provisions. (*See id.* at GF 1658-59.)

After LNT executed the assignment agreements with Garden Fresh, Garden Fresh became a tenant in the Village Square Shopping Center and continued to fulfill its obligations under those agreements. However, on May 2, 2008, LNT filed for bankruptcy protection in the United States Bankruptcy Court for the District of Delaware. After LNT filed for bankruptcy, Garden Fresh, as was its practice, tendered $40,000 in rent payments to LNT in both May and June of 2008, but Northbrook never received those payments from LNT. Nonetheless, there is no indication in the record that Northbrook notified CVS or LNT of a default as a result of LNT's unpaid rent. In July 2008, Garden Fresh paid rent directly to Northbrook in the amount of $65,781.18.

On June 9, 2008, LNT asked the bankruptcy court to reject the Lease as a matter of law, including it in a list of unexpired leases that it submitted to that court. In that request, LNT also sought to reject the assignment agreements it had made with Garden Fresh. (*See* Ex. B to Def.'s Resp. to Pls.' 56.1 Stmt. of Material Fact, ECF No. 56.) On June 24, 2008, Northbrook opposed the motion seeking to reject the Lease, asserting that,

3

pursuant to the assignment agreements, LNT "assigned all of its right, title, interest and estate as tenant under the Lease" to Garden Fresh. (*See id.* Ex. C.) On June 27, 2008, the bankruptcy court issued an order rejecting certain of LNT's commercial leases and subleases, but not the Lease or the assignment agreements. (*See id.* Ex. D.)

While LNT's bankruptcy proceedings were ongoing, Northbrook entered into a new lease agreement directly with Garden Fresh (the "New Lease"). Although the commencement date of the New Lease was July 1, 2008, the New Lease was executed by Northbrook and Garden Fresh on July 31, 2008. The New Lease provided Garden Fresh with a lease term of ten years; Garden Fresh would be responsible for monthly payments of $34,448.25 from July 1, 2008 through June 30, 2013 and payments of $37,893.08 from July 1, 2013 through June 30, 2018. The New Lease did not name CVS or anyone else as guarantors (*see* Ex. A, Tab 4, at GF 1667), and a rider to the New Lease acknowledged that the original Lease had been previously "assigned from [LNT] to [Garden Fresh]." (*Id.* at GF 1704.) The rider further stated that, "[t]o the parties' knowledge, LNT declared bankruptcy, rejected the [Lease], and has no rights in or to the [Lease]," and that "[Northbrook] and [Garden Fresh] hereby terminate the [Lease] effective as of the Commencement Date of this [New Lease], it being the intention of the parties hereto that this [New Lease] supersede and replace the [Lease] . . . ." (*Id.*) After the New Lease was executed, the original Lease was rejected by operation of law on August 30, 2008 pursuant to 11 U.S.C. § 365(d)(4).[4]

---

[4]     This fact is deemed admitted by Northbrook by virtue of the fact that it denied the asserted fact without any citation to the record or explanation. *See Michas v. Health Cost Controls*, 209 F.3d 687, 689 (7th Cir. 2000); (Pl. Resp. to Def. Stmt. of Add'l Uncontested Facts at 4 ¶ 57, ECF No. 60.) Nonetheless, Northbrook wrote to CVS that the bankruptcy court did not authorize LNT to reject the lease until June 15, 2009. (*See* Ex. 5 to Pl. 56.1 Stmt. of Material Fact at GF 1720.)

Almost one year later, on August 11, 2009, Northbrook sent a letter to CVS contending that CVS was liable under the Guaranty because LNT was "in default of its obligations under the Lease." (*See* Ex. A, Tab 5, at GF 1720.) Northbrook asserted that it had suffered damages totaling over $1 million, (*see id.*), and demanded payment. (*See id.* at GF 1721.) CVS rejected this demand on September 17, 2009. (*See id.* Ex. A, Tab 6, at GF 1722.) After Northbrook renewed the demand on October 14, 2009, CVS once again rejected it on October 28, 2009. (*See id.* Ex. A, Tabs 7-8, at GF 1724-25.) This litigation was then filed in the Circuit Court of DuPage County on January 5, 2010, and it was removed to this court on February 9, 2010 based on diversity jurisdiction.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When reviewing a motion for summary judgment, the court should view all evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor. *See Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). However, the party who bears the burden of proof on an issue may not rest on the pleadings or mere speculation, but must affirmatively demonstrate that there is a genuine issue of material fact that requires a trial to resolve. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008). The evidence presented must comport with the Federal Rules of Evidence and be admissible at trial, *United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010), and it must consist of affidavits or declarations "made on personal knowledge, set[ting] out

facts that would be admissible in evidence, and show[ing] that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

### III. ANALYSIS

This is a case of contract interpretation. In its motion for partial summary judgment, Northbrook contends that LNT breached its obligations under the Lease, triggering CVS's liability under the Guaranty. Northbrook claims that LNT breached its obligations when it declared bankruptcy and subsequently failed to pay rent to Northbrook. CVS responds that (1) the July 2003 assignment agreements caused Garden Fresh to assume all of LNT's obligations under the Lease, releasing CVS from any subsequent liability stemming from LNT's actions; (2) Northbrook failed to tender notice of non-payment of rent to either LNT or Garden Fresh between May and June of 2008, suggesting that there was not a breach of the Lease; and (3) Northbrook terminated the original Lease on July 31, 2008, the date that the New Lease between Northbrook and Garden Fresh was executed.

The parties agree, and the relevant contracts stipulate, that Illinois law applies to the analysis of the contracts at issue. In Illinois, "[t]he rules of construction of contracts apply generally to contracts of guaranty." *McLean Cnty. Bank v. Brokaw*, 519 N.E.2d 453, 456 (Ill. 1988). The court needs to "effectuate, if ascertainable, the intent of the parties to the contract." *Id.* (citing *Blackhawk Hotel Assocs. v. Kaufman*, 421 N.E.2d 166 (Ill. 1981)). Nonetheless, "[a] guarantor is to be accorded the benefit of any doubt which may arise from the language of the contract, and his liability is not to be varied or extended by construction or implication beyond its precise terms." *Id.*

**A. Effect of the July 2003 Assignment Agreements on CVS's Liability**

Applying these principles of contract interpretation, the July 2003 assignment agreements between LNT and Garden Fresh did not absolve CVS of any potential liability under the Guaranty. The Guaranty clearly states that "the obligation of Guarantor shall not be released or affected by . . . (c) *any* assignment or other transfer of the Lease or *any* sublease of *all or part* of the Leased Premises by [LNT]." (Ex. 1, Tab 2, at GF 1638 (emphases added).) Further, "[t]he liability of Guarantor shall not be impaired by reason of "[*a*]*ny* transfer, assignment or subleasing or consent to any transfer, assignment or subleasing of Tenant's interest under the Lease or any part of the Leased Premises . . . ." (*Id.* (emphasis added).) Thus, CVS—through its predecessor, Melville—agreed to assume the risk of liability in circumstances where LNT assigned the Lease to other parties. LNT's July 2003 assignment agreements with Garden Fresh did not have any legal effect on CVS's liability.

**B. CVS's Obligations Resulting From LNT's Default**

1. LNT's Failed Payment Obligations in May and June 2008

As the Guaranty states, "Upon the occurrence of any default by Tenant, Guarantor shall pay, and hereby agrees to pay, to Landlord such rentals, costs, expenses, charges, payments and deposits and shall satisfy all covenants to be performed by Tenant." (Ex. A, Tab 2, at GF 1637.) Because CVS was not absolved of its prospective liability as of the July 2003 assignment agreements, and it therefore remained liable for any default that LNT incurred under the Lease, the court examines whether such a default ever occurred. Northbrook contends that LNT defaulted in May and June 2008 when LNT declared bankruptcy and failed to make its rent payments to Northbrook.

The court concludes that LNT defaulted on the Lease because it failed to pay rent to Northbrook in May and June of 2008.[5] The original Lease contemplates default when the tenant—in this case LNT—"defaults in the payment of any installment of Annual Minimum Rent or other charges payable . . . by Tenant . . . ." (Ex. A, Tab 1, at GF 1613.) LNT defaulted on its obligations because the record indicates that Garden Fresh provided LNT with rent checks for $40,000 to pay rent in both May and June of 2008[6] and that, despite being given these checks, LNT never forwarded those rent payments to Northbrook. Moreover, nothing in the record suggests that LNT fulfilled any of its other payment obligations in May and June 2008.[7] Thus, there is no genuine issue of material fact as to whether or not LNT defaulted in those months.[8]

---

[5]     The court agrees with CVS that LNT's decision to file for bankruptcy protection, in and of itself, was not a default. (*See* Ex. A., Tab 1, at GF 1614.)

[6]     The July 31, 2003 agreement stipulated that Garden Fresh pay its $40,000 monthly share of rent directly to Northbrook. Nonetheless, LNT was still obligated to pay all Annual Minimum Rent "directly to [Northbrook]" under the same agreement. (*See* Ex. A, Tab 3, at GF 1658.) Thus, even if Garden Fresh improperly paid its rent to LNT instead of Northbrook, this did not discharge LNT's obligation to ensure that Northbrook ultimately received all of its rents under the Lease.

[7]     LNT retained other payment obligations under the assignment agreement, including but not limited to "Tenant's Share of [Common Area Maintenance] Costs, Tenants Share of Taxes, and Tenant's Share of Landlord's Insurance Costs," minus the $40,000 that would be tendered by Garden Fresh. (*See* Ex. A, Tab 3, at GF 1658.)

[8]     There is enough evidence in the record that this is an undisputed fact. The record contains copies of the $40,000 May and June 2008 rent checks paid to LNT from Garden Fresh (*See* Ex. E at GF 1741-42), sworn interrogatory responses from Garden Fresh aver that these payments were made directly to LNT in May and June 2008 (*see* Ex. F at 10), and Northbrook filed an administrative proof of claim in the bankruptcy court indicating that it never received $49,081.84 for its May and June 2008 expenses under the Lease from LNT, including $13,919 in stub rent for May 2008, $30,382.14 for taxes due in June 2008, and $4,780.70 for common area maintenance charges for June 2008. (*See* Ex. H at 4.) CVS does not dispute any of these points with admissible evidence; rather, it attaches a Rule 56(f) (now Rule 56(d)) affidavit asserting that additional discovery is needed on this issue. (*See* Ex. A to Def.'s Response to Pl. 56.1 Stmt., ECF No. 56.) However, the parties have already completed written discovery and the court is unconvinced that oral discovery will refute the evidence that LNT defaulted in May and June of 2008.

2. <u>The Effect of Lack of Notice on CVS's Liability</u>

Although LNT defaulted on its rent and other payment obligations in May and June of 2008, CVS argues that LNT did not technically commit a default because "neither LNT nor Garden Fresh received a notice of default from Northbrook." (*See* Def. Br. in Opp'n at 9, ECF No. 55.) The court agrees with CVS that nothing in the record indicates that such notice was provided to LNT or Garden Fresh in or around May or June 2008 when LNT failed to pay certain of its obligations; indeed, the first notice of LNT's default did not occur until Northbrook sent a letter to CVS on August 11, 2009.

The question is whether the lack of timely notice to LNT, Garden Fresh, or CVS absolves CVS from liability for LNT's failure to pay rent and other charges to Northbrook in May and June of 2008. As CVS correctly notes, Section 18.01 of the Lease, which governs default, states:

> If Tenant defaults in the payment of any installment of Annual Minimum Rent or other charges payable hereunder by Tenant and such default is not cured within ten (10) days after receipt of notice from Landlord thereof . . . , then Landlord may, by giving notice to Tenant at any time thereafter during the continuance of such default, (i) terminate this Lease . . ., or (ii) with or without terminating this Lease, as Landlord may elect, re-enter and repossess the Premises . . . . (Ex. A, Tab 1, at GF 1614.)

CVS reads this provision to mean that a default, and therefore CVS's liability under the Guaranty, can only be triggered under the Lease if Northbrook notified LNT or Garden Fresh of the delinquent rent payments.

There are two reasons why CVS must remain liable under the Guaranty despite Northbrook's failure to notify LNT or Garden Fresh about the failed rent payments. First, the language in Section 18.01 does not say that notice is a mandatory precondition to a default under the Lease. It states that the Landlord "*may* . . . give notice" to the tenant

when the tenant defaults, not that it must provide such notice. (*Id.* (emphasis added).) Moreover, the purpose of the notice provision is to provide the landlord with an option to terminate the lease or mitigate damages. Whether or not the landlord chooses to exercise those options under the Lease does not change the fact that the tenant defaults when he does not pay rent. Thus, the lack of notice does not negate LNT's default here.

More importantly, CVS explicitly waived such notice in the Guaranty. IThe Guaranty explicitly provided that the "Guarantor waives . . . (d) notice to Tenant, Guarantor or any other guarantor or person of the non-payment or non-performance by Tenant of any condition of the Lease." (Ex. A, Tab 1, at GF 1639.) This contract language could not be any clearer; it indicates that CVS agreed to waive notice of LNT's nonpayment of rent to LNT as the tenant, itself as Guarantor, and to Garden Fresh as another person. Thus, regardless of whether or not Northbrook provided notice of LNT's default, CVS agreed to remain liable under the Guaranty. There is no ambiguity to the contract language in this respect.

**C. The New Lease Terminated CVS's Obligations Under the Original Lease as of July 31, 2008, But Did Not Free CVS From Its Previous Obligations Under the Guaranty**

Even though CVS was not relieved of liability as a result of Northbrook's failure to provide notice of LNT's default, CVS argues that it was relieved of liability when Northbrook entered into the New Lease with Garden Fresh on July 31, 2008. Specifically, it argues that the New Lease terminated the original Lease, thereby absolving LNT (and, by implication, CVS) from any obligation associated with the Lease.

CVS is correct when it argues that "the general rule [with respect to Guaranty agreements] is that discharge, satisfaction, or extinction of the principal obligation also

10

ends the liability of the guarantor." *Palen v. Cullom Captal Woodworking, Inc.*, 506

N.E.2d 1062, 1063 (Ill. App. Ct. 1987). This general rule implies that "if no recovery

could be had against the principal debtor, the guarantor would also be absolved from

liability." *Hensler v. Busey Bank*, 596 N.E.2d 1269, 1274 (Ill. App. Ct. 1992). But even if

the underlying obligations of the principal "have been discharged or otherwise

terminated," the court still "must examine the guaranty contract to determine whether the

principal's discharge also functions as a discharge of the guarantor." *Riley Acquisitions,*

*Inc. v. Drexler*, 946 N.E.2d 957, 963 (Ill. App. Ct. 2011). The court engages in a two-part

inquiry. *See id.*

      1. <u>LNT was Discharged from Liability when Northbrook Executed the New Lease</u>

      As to the first part of this inquiry, the principal debtor under the Lease—in this

case LNT—was relieved of all prospective liability under the Lease when Northbrook

agreed to the New Lease with Garden Fresh on July 31, 2008. Even though the court

agrees with Northbrook that LNT had defaulted under the lease when it failed to make

rent payments shortly after declaring bankruptcy, Northbrook made the decision to

relieve LNT of its prospective liability under the Lease when it signed the New Lease. As

the rider to the New Lease specifically stated:

> [Northbrook] and [Garden Fresh] hereby acknowledge that [Garden Fresh]
> occupies the Premises pursuant to that certain Lease dated September 21, 1994 . .
> . . The [Lease] was assigned from [LNT] to [Garden Fresh]. To the parties'
> knowledge, LNT declared bankruptcy, rejected the [Lease], and has no rights in
> or to the [Lease]. . . . [Northbrook] and [Garden Fresh] hereby terminate the
> [Lease] effective as of the Commencement Date of this [New Lease], it being the
> intention of the parties hereto that this [New Lease] supersede and replace the
> [Lease] . . . . (Ex. 4 to Pl. 56.1 Stmt. of Material Facts at GF 1704.)

The intent of this clause could not be any clearer: Northbrook terminated the Lease and supplanted it with the New Lease, thus releasing LNT from any future obligations that it otherwise would have had under the Lease.

Even if the court were to accept Northbrook's characterization of the New Lease as a "mitigation lease," that would be of no moment to the determination that Northbrook chose to relieve LNT of its prospective liability under the original Lease. Section 18.01 of the Lease made clear that, when Northbrook exercised its discretion to mitigate damages under the Lease, it had the discretion to do so "with or without terminating the Lease." (Ex. A, Tab 1, at GF 1614.) Thus, even assuming for the sake of argument that Northbrook properly mitigated damages under the Lease by entering into the New Lease with Garden Fresh, there can be no doubt that Northbrook had the choice—and made the choice—to terminate LNT's obligations under the Lease.

2. The Guaranty Does Not Provide for CVS's Liability Upon Termination of the Lease

However, the fact that Northbrook relieved LNT of liability under the Lease when it executed the New Lease does not end the court's inquiry. As noted above, it must also examine the Guaranty to assess whether the termination of LNT's obligation also discharged CVS's obligation as guarantor. *See Drexler*, 946 N.E.2d at 963. In deciding whether CVS remains liable despite LNT's discharge, CVS must be accorded the benefit of the doubt as to any ambiguity in the Guaranty. *See McLean Cnty. Bank*, 519 N.E.2d at 456. CVS's liability under the Guaranty "is strictly construed in [its] favor and against the party in whose favor the guaranty runs." *Hensler*, 596 N.E.2d at 1274 (citing *Lincoln Park Fed. Sav. & Loan Ass'n v. Carrane*, 548 N.E.2d 646, 638 (Ill. App. Ct. 1989)).

Although the Guaranty stipulates that CVS remains liable under the Lease in the event of numerous contingencies, in no part of the Guaranty does it state that the guarantor's liability continues even when the Lease is terminated and replaced by another lease. Specifically, the Guaranty states that it is "irrevocable, absolute, present, continuing and unconditional, and the obligation of Guarantor shall not be released or affected" in the event of several contingencies. (*See* Ex. A, Tab 2, at GF 1644-45.) It provides that the obligations and liabilities of the guarantor will not be released by modifications of the Lease, failures to enforce provisions of the Lease, assigning or subletting under the Lease, granting of licenses regarding the leased premises, and repossession of those premises. (*See id.* at GF 1645.) It even states that "the release or discharge of Tenant . . . in bankruptcy" would not impair CVS's liability. (*Id.*) Unfortunately for Northbrook, none of these contingencies occurred here. The New Lease, as discussed above, was not an assignment or sublease of the original Lease—it was an entirely new lease that released LNT of its obligations and supplanted the original Lease.

Given that nothing in the Guaranty provides that the liability of the guarantor survives the termination of the Lease, the court concludes that CVS was relieved from liability under the Guaranty when the New Lease was signed.[9] This is especially true given Illinois law's special solicitude to guarantors, which requires that this court accord parties like CVS "the benefit of the doubt" when interpreting guaranty contracts. Because nothing in the Guaranty suggests that CVS retains liability under the Guaranty in the event the Lease is terminated, CVS cannot be liable for any defaults under the Lease after

---

[9]     Another provision in the Guaranty supports this conclusion: "This Guaranty shall terminate and be of no further force or effect at such time as all of Tenant's obligations under the Lease, as amended from time to time, have been satisfied and released." (Ex. A, Tab 2, at GF 1646.)

July 31, 2008. *Cf. Lyon Fin. Servs., Inc. v. Bella Medica Laser Ctr., Inc.*, 738 F. Supp. 2d 856, 862 (N.D. Ill. 2010) (concluding under Illinois law that where "the Guaranty [was] not a clear and unambiguous indication of consent" by the guarantor to be liable in a circumstance where a lease re-write terminated an original lease, the guarantor's obligations "ended with the formation of the Lease Re-write").

## IV. CONCLUSION

For the reasons stated above, Northbrook's motion for partial summary judgment against CVS is granted as to any defaults that may have occurred under the Lease prior to July 31, 2008, but is denied as to any defaults after that date. CVS's cross-motion for summary judgment is denied.

ENTER:


_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED:  February 17,  2012